IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Soudabeh Darvish, | ) | OPINION |
| | ) | |
| Petitioner, | ) | Case No. 20100981-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Labor Commission Appeals Board and | ) | (March 8, 2012) |
| Salt Lake County Environmental Health | ) | |
| Services, | ) | 2012 UT App 68 |
| | ) | |
| Respondents. | ) | |

-----

Original Proceeding in this Court

Attorneys:    Robert H. Wilde and Bruce M. Franson, Salt Lake City, for Petitioner
Alan L. Hennebold, Salt Lake City, for Respondent Labor Commission
Simarjit Singh Gill and David H.T. Wayment, Salt Lake City, for
Respondent Salt Lake County Environmental Health Services

-----

Before Judges Voros, Orme, and Davis.

VOROS, Associate Presiding Judge:

¶1     Petitioner Soudabeh Darvish petitions for review of a decision of the Utah Labor
Commission Appeals Board. The Board ruled that Darvish's claim for retaliation based
on national origin was legally unsupportable. We decline to disturb the Board's ruling.

BACKGROUND

¶2     The Board adopted the "relevant portions" of the findings of fact entered by the Administrative Law Judge (ALJ). The ALJ's findings are not challenged on appeal, and we summarize them here.[1]

¶3     Darvish is an Iranian-born Persian of the Islamic faith. She holds a master's degree in Occupational and Industrial Hygiene and is a licensed Environmental Health Specialist. From 2002 to 2003 she worked for Salt Lake County as an inspector assigned to food establishments and swimming pools. During that time she received satisfactory performance evaluations. In June 2003 Darvish left the County to work as an industrial hygienist for the State of Utah. However, in January 2004, the County rehired her as a health inspector. Despite her previous employment, Darvish was put on probationary status for six months like any other new hire. The County's written policies allowed the termination of a probationary employee without cause, but Royal Delegge, the Director of Regulatory Enforcement of the Department of Health, testified that he would terminate a probationary employee only for cause.

¶4     Shortly after returning to work at the County, Darvish approached a lead inspector, Jeff Oaks, and asked him for a list of food establishments to inspect. Darvish's cubicle-mate, Jessie Morris, overheard the question and commented, "These Persians cannot come here and tell us what to do." Darvish reported the comment to her supervisor, Eric Peterson. She asked him to move her out of Morris's cubicle, transfer her to another team, and educate Morris about the impropriety of her comment. Peterson did not discipline Morris; in fact, he passed her from probation to merit status two days later. However, he began to take a number of disciplinary actions against Darvish.

¶5     For example, in March 2004 when Morris complained that Darvish had inspected some "3 and 4 risk level food establishments," Peterson issued a written "verbal warning" to Darvish for failing to follow his directive to perform only level 1 and 2 inspections. However, Peterson later admitted that his original directive was ambiguous, that Darvish had routinely performed level 3 and 4 inspections for the

---

[1]Salt Lake County presents the factual background in a somewhat different light. But the County never directly argues that we should revisit the ALJ's factual findings.

County during her prior employment, and that the list of food establishments given to her to inspect included level 3 and 4 inspections. A few days later, Darvish filed a team-change request with Peterson's supervisor, Bryce Larson. After consulting with Peterson, Larson rejected the request without explanation.[2]

¶6    In April 2004, Peterson and Larson gave Darvish an employee performance evaluation and corrective action plan. Based on the earlier "verbal warning," the performance evaluation rated Darvish low in the category of "Follows Policies and Procedures." The corrective action plan thus mandated: "Effective immediately, you must consistently follow directions given by your supervisor." However, Peterson later acknowledged that, as of the date of the corrective action plan, "Darvish no longer had a problem with following directions" and that she had been following the directions of her supervisors since she received the "verbal warning." Based on Darvish's earlier requests for a team transfer, the performance evaluation also rated her low in the category of "Working Effectively in Team Settings." The corrective action plan thus mandated: "Effective immediately, you must understand and support the concept of team work." However, again, Peterson later acknowledged that disciplining an employee for requesting a team transfer was improper. And Peterson and Larson both acknowledged that nine out of eleven employees disliked the team concept, which was abandoned a short time later. Based on this evidence, the ALJ found that Peterson marked Darvish down on her performance evaluation and put her on corrective action "because she asked to be moved out of the cubicle and off the team she shared with Jessie Morris after she commented 'These Persians cannot come here and tell us what to do.'"

¶7    After receiving the performance evaluation and corrective action plan, Darvish accused Peterson of retaliating against her and threatened to file a retaliation complaint against him. She also complained to Delegge. Thereafter, the plan and evaluation were amended, but the amended versions varied only in format and not at all in substance from the originals issued one month earlier. Darvish again complained to Peterson. He responded by ordering her "to file a written discrimination complaint against Jessie Morris by the end of the day." Faced with competing medical and job-related demands, Darvish failed to complete the written discrimination complaint that day. In an email to

---

[2]Apparently the chain of command went up from Darvish to Peterson to Larson to Delegge.

Larson, Peterson described this failure as "insubordination." However, in violation of County policy, Peterson himself never filed a written report concerning Darvish's complaints of discrimination or retaliation.

¶8    By May 17, 2004, Peterson had made his final decision to terminate Darvish's employment. Nevertheless, on May 19 he "cynically" (according to the ALJ) sent her a memo setting their first meeting under her corrective action plan for May 27. Peterson knew that Delegge opposed Darvish's termination. When Delegge left town, Peterson obtained approval for the termination from Patty Pavey, the Director of the Salt Lake County Health Department. Pavey's decision concerning termination was based solely on information furnished by Peterson.

¶9    Peterson and Larson fired Darvish on May 24, 2004. According to what the Board referred to as "the incoherent reasoning" of the termination notice, the first reason for the termination was the March 2004 "verbal warning" concerning her inspection of level 3 and level 4 facilities. However, Darvish's employee performance evaluations for April and May of 2004, as well as Peterson's own testimony, "demonstrated that she had no problems with following directions after the verbal warning."

¶10    The second and, according to the ALJ, "most damning" reason given for Darvish's termination was her conflict with her coworker over the latter's comment, leading to Darvish's request for a transfer out of her cubicle and off of her team. Peterson "repeatedly referenced Ms. Darvish's complaints and requests stemming from the . . . Persian comment as a failure to work effectively in a team setting" and grounds for negative employee evaluations, corrective action, and ultimately termination. In fact, the ALJ referred to this reliance as "the smoking gun of retaliation in this case."[3]

---

[3]In its brief, the County marshals record evidence casting Darvish in a less favorable light. For example, some supervisors who had known Darvish during her first stint at the County were concerned, based on her earlier job performance, that she was being rehired. Also, testimony was admitted to the effect that Darvish chose to inspect higher-risk establishments because they were more convenient to her home. However, neither the ALJ nor the Board made any findings based on this evidence.

¶11    The ALJ concluded that Darvish came to her position "eminently qualified for the job by education and experience including a prior satisfactory stint" in the same department, and that she was terminated in retaliation for her "protected action" of complaining about the comment regarding Persians, a comment "directed at Ms. Darvish's personal race, ethnicity and national origin."  The ALJ further concluded that the nondiscriminatory reasons given for her termination—particularly the failure to follow directions—were "pretextual."

¶12    Darvish filed a charge of discrimination with the Utah Antidiscrimination and Labor Division of the Labor Commission (UALD).  She asserted that the County had retaliated against her "based on her race (Persian), color, sex (female), religion (Muslim) and national origin (Iranian)."  UALD found in Darvish's favor, and the County requested a hearing before an ALJ.  Based on the facts summarized above, the ALJ concluded that the County terminated Darvish "in retaliation against her for engaging in protected activity opposing discrimination in the form of derogatory comments made by a co-worker against her race and national origin."[4]  The County filed a motion for review before the Appeals Board of the Labor Commission.

¶13    Initially, the Board unanimously affirmed the ruling of the ALJ.  It ruled that Darvish "engaged in protected opposition to discrimination when she lodged a good-faith complaint to Mr. Peterson . . . about Ms. Morris's racially insensitive comment."[5]  It further found "a causal connection between Ms. Darvish's complaint and her eventual termination."  The Board concluded that Darvish's "not working effectively with someone who bore a racial animus against her is not a legitimate reason for termination."  Further, the Board found that the County's recognition that Darvish had improved in following instructions after her initial "verbal warning" "belies Salt Lake County's position that Ms. Darvish's behavior went from requiring only a verbal warning to somehow requiring her termination without any intermediate reoccurrence."

---

[4]The ALJ did not rule that Darvish had suffered retaliation for participating in a proceeding, investigation, or hearing under the Utah Antidiscrimination Act.

[5]The Board did not rule that Darvish had suffered retaliation for participating in a proceeding, investigation, or hearing under the Utah Antidiscrimination Act.

¶14    The County timely filed a request for reconsideration. Citing *Clark County School Board District v. Breeden*, 532 U.S. 268 (2001) (per curiam), the County argued that, "as a matter of law, Darvish's complaint cannot have been [made] in good faith." Approximately seven weeks later, the Board reversed its earlier decision on a 2-1 vote.

¶15    The Board majority noted that, "[f]or the first time in this case, Salt Lake County cites to *Clark County School Board District v. Breeden*, 532 U.S. 268 (2001), in which the United States Supreme Court provides significant insight into the term 'reasonable belief' in the context of Title VII retaliation complaints." Based on the reasoning in that case, the Board concluded that "no reasonable person could believe that the conduct Ms. Darvish complained of constituted discriminatory conduct." Accordingly, the Board set aside its prior decision and dismissed Darvish's complaint of unlawful retaliation. One member of the Board dissented, distinguishing *Breeden* on its facts.

## ISSUES AND STANDARDS OF REVIEW

¶16    Darvish advances multiple challenges to the Board's ruling. We consider two in detail. First, she contends that because the County's request for reconsideration was deemed denied under Utah Code section 63G-4-302(3)(b), the Board lacked jurisdiction to later grant it. "The issue of whether an agency has jurisdiction is a question of law, which we review for correctness." *Mendoza v. Labor Comm'n*, 2007 UT App 186, ¶ 5, 164 P.3d 447 (citing *Stokes v. Flanders*, 970 P.2d 1260, 1262 (Utah 1998)).

¶17    Second, Darvish contends that, contrary to the Board's ultimate ruling, she was fired because of either her participation in protected activity or her opposition to illegal activity. This contention requires interpretation of a statute and thus presents a question of law that we review for correctness. *See Esquivel v. Labor Comm'n*, 2000 UT 66, ¶ 13, 7 P.3d 777.

## ANALYSIS

### I. Validity of the Board's Order

¶18    Darvish contends that the Board's order granting the County's request for reconsideration is void. She argues that the request was denied by operation of law

before the Board ever acted on it and thus the Board lost jurisdiction to grant the request.

¶19     Under the Utah Administrative Procedures Act, if the Board "does not issue an order within 20 days after the filing of the request, the request for reconsideration shall be considered to be denied." Utah Code Ann. § 63G-4-302(3)(b) (2011). Here, the Board originally ruled on September 21, 2010. The County timely filed its request for reconsideration on October 6, 2010. The Board did not grant or deny the request within twenty days. However, contrary to Darvish's argument on appeal, the Board extended until November 30, 2010, the time period in which it would act on the request "in order to allow other parties to respond and to allow the Board sufficient time to consider the request." The Board granted the request by the revised deadline.

¶20     Utah courts have repeatedly held that an administrative agency may act on a request for reconsideration after expiration of the twenty-day presumptive denial period set out in the Utah Administrative Procedures Act. *See Prince v. State Tax Comm'n*, 1999 UT 11, ¶ 3, 974 P.2d 284 (citing *Evans & Sutherland Computer Corp. v. State Tax Comm'n*, 953 P.2d 435, 439 (Utah 1997); *Harper Invs., Inc. v. State Tax Comm'n*, 868 P.2d 813, 816 (Utah 1994); *49th St. Galleria v. Tax Comm'n*, 860 P.2d 996, 999 (Utah Ct. App. 1993)); *see also Blauer v. Department of Workforce Servs.*, 2007 UT App 280, ¶ 8 n.1, 167 P.3d 1102 ("[I]f the agency issues a written order denying the request for reconsideration after the deemed denied date, the thirty-day time period to petition for judicial review runs from the date of the written order." (emphasis omitted)). Furthermore, Utah Code section 63G-4-102(9) provides that "[n]othing in this chapter may be interpreted to restrict a presiding officer, for good cause shown, from lengthening or shortening a time period prescribed in this chapter, except the time period established for judicial review." That occurred here. Therefore, the Board retained jurisdiction to grant the motion for reconsideration. *See Prince*, 1999 UT 11, ¶ 3; *McCoy v. Utah Disaster Kleenup*, 2003 UT App 49, ¶¶ 7, 13, 20, 65 P.3d 643 (involving an extension of the reconsideration period by the agency).

## II.  Retaliation Under the Utah Antidiscrimination Act

¶21     Darvish next contends that the Board erred in setting aside its original order and dismissing her complaint.

¶22 Darvish's claims arise under the Utah Antidiscrimination Act. The Act protects Utahns against workplace discrimination, harassment, or retaliation based on race, color, sex, pregnancy, childbirth, age, religion, disability, or national origin. *See* Utah Code Ann. §§ 34A-5-102(1)(q), -106(1)(a)(i) (2011).[6] Darvish contends that she suffered retaliation based on her participation in an internal investigation and her opposition to an employment practice prohibited under the Utah Antidiscrimination Act. "Retaliation" is defined as taking an adverse action against an employee either because the employee has (1) opposed a prohibited practice or (2) participated in a proceeding, investigation, or hearing under the Act:

> "Retaliate" means the taking of adverse action by an employer, employment agency, labor organization, apprenticeship program, on-the-job training program, or vocational school against one of its employees, applicants, or members because the employee, applicant, or member has:
> (i) opposed any employment practice prohibited under this chapter; or
> (ii) filed charges, testified, assisted, or participated in any way in any proceeding, investigation, or hearing under this chapter.

*Id.* § 34A-5-102(1)(q). The statute thus identifies two categories of protected activity: opposing workplace discrimination or harassment, and participating in a proceeding, investigation, or hearing under the Act. Darvish presses both types of claims on appeal.

¶23 "[T]he [Utah Antidiscrimination Act] was modeled after Title VII of the Civil Rights Act of 1964," *Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 16, 61 P.3d 989, and the definition of "retaliation" in section 34A-5-102(1)(q) of the Utah Antidiscrimination Act closely resembles its federal counterpart in Title VII. *See* 42 U.S.C. § 2000e-3(a) (2006) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or

---

[6]The relevant sections of the Utah Antidiscrimination Act have not been materially altered since the case arose. We therefore cite to the current version of the code for the reader's convenience.

participated in any manner in an investigation, proceeding, or hearing under this subchapter.").  For this reason, in interpreting the Utah Antidiscrimination Act, the substantial body of federal case law interpreting Title VII is "useful."  *See Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 6, 38 P.3d 993.

## A.  Participation

¶24     Darvish contends that the County retaliated against her for having "participated in any way in any proceeding, investigation, or hearing" under the Utah Antidiscrmination Act.  *See* Utah Code Ann. § 34A-5-102(1)(q)(ii).  The County responds that Darvish failed to preserve this claim in the agency proceeding.  We agree.

¶25     "[I]ssues not raised in proceedings before administrative agencies are not subject to judicial review except in exceptional circumstances."  *Brown & Root Indus. Serv. v. Industrial Comm'n*, 947 P.2d 671, 677 (Utah 1997).  "The rule that courts should not reach issues on review that were not raised before an administrative agency is . . . basic and necessary to orderly procedure . . . ."  *Id*.  Rule 24 of the Utah Rules of Appellate Procedure thus requires the appellant's opening brief to include, for each issue presented for review, "citation to the record showing that the issue was preserved in the trial court."  Utah R. App. P. 24(a)(5)(A).  This rule applies to review of the orders of administrative agencies.  *See Esquivel v. Labor Comm'n*, 1999 UT App 9, ¶ 23, 973 P.2d 440 (citing Utah R. App. P. 24(a)(5)(A) and stating that "[b]ecause the issue was not raised before the Board, and because the [petitioners'] brief on this issue does not conform to our Rules of Appellate Procedure, the [petitioners] have waived their right to appeal this issue"), *rev'd in part on other grounds*, 2000 UT 66, 7 P.3d 777.

¶26     Darvish's opening brief does not comply with this requirement.  In response to the County's argument, Darvish's reply brief does cite to several parts of the record.  Most of these citations are to portions of the record that refer to the fact that she filed a discrimination claim.  But filing a discrimination claim, even a retaliation claim, is not necessarily the same as filing a participation claim.  The other citations to the record offered by Darvish are simply to cases or texts that refer to participation claims as well as opposition claims.  Such references are insufficient to preserve a claim for review.  For one thing, they do not seek a ruling from the agency.  And, unsurprisingly, neither the ALJ nor the Board addressed the participation prong.  Thus, Darvish's participation claim was not preserved in the course of the administrative proceeding and is consequently not properly before us on review.

B.  Opposition

¶27    Darvish also contends that the County retaliated against her for opposing workplace discrimination.  *See* Utah Code Ann. § 34A-5-102(1)(q)(i).

¶28    The Utah Antidiscrimination Act prohibits retaliation based on opposition to "any employment practice prohibited under this chapter."  *Id.*  The Act prohibits an employer from harassing or discriminating against an otherwise qualified person in the terms, privileges, and conditions of employment.  *Id.* § 34A-5-106(1)(a)(i).  Discrimination in the conditions of employment can be established by showing that the employer has either created or negligently allowed coworkers to create a hostile work environment.  *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1138 (10th Cir. 2008) (interpreting Title VII of the Civil Rights Act of 1964); *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951–52 (7th Cir. 2005) (same).

¶29    To be protected against retaliation, an employee need not oppose a practice later determined by a court to have violated the Act.  All that is required is that the employee demonstrate "a *good faith, reasonable belief* that his or her employer had discriminated against him or her."  *Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 10, 38 P.3d 993 (citing federal cases interpreting Title VII).  This approach strikes a balance between, on the one hand, "chill[ing] employee opposition to improper discrimination by requiring the employee to be correct in his belief that the employer's protested action was illegal discrimination in order for that opposition to be protected" and, on the other, "insulating an employee from an employer's retaliation for an unreasonable or bad-faith claim of discrimination."[7]  *Id.* ¶ 10 n.4.

---

[7]The County's policy on discrimination and retaliation appears to afford greater protection.  It declares that all County employees "have the right to file a grievance on matters related to harassment or discrimination, and may do so without fear of reprisal."  In addition, "Employees reporting misconduct, including harassment or discrimination, are protected against retaliation."  Indeed, "[a]ny act of reprisal toward the complainant or witnesses shall be subject to separate corrective or disciplinary action."  However, the present appeal deals with relief under the Utah Antidiscrimination Act, not the County policy.

¶30    The question, then, is whether Darvish held a reasonable, good faith belief that the employment practice she opposed was prohibited by the Act. The ALJ did not address this question. The contest at the administrative hearing involved causation—did the County fire Darvish because of her complaint or because of her job performance? On review, however, the Board did address the question, albeit only after the County sought reconsideration. And it concluded that "no reasonable person could have believed that such an isolated comment from a coworker violated Title VII or the Utah Antidiscrimination Act." Darvish challenges this conclusion, arguing that a reasonable person could see a single comment by a coworker as "an employment practice prohibited by" the Act.

¶31    The County never actually concedes that it terminated Darvish for complaining about the comment—in fact, it points to testimony critical of her job performance. But neither does it challenge the ALJ's findings that the reasons given for her termination were pretextual. Rather, the County contends that "[n]o reasonable person could have entertained a good faith belief" that "an isolated remark about Persians" rose to the level of discrimination prohibited by the Utah Antidiscrimination Act. While the County concedes that the remark may have been offensive, it notes that Title VII and the Utah Antidiscrimination Act "are not a code of civility." In effect, the County's position is that it did not retaliate against Darvish for her complaint, but even if it did, any retaliation was lawful because her complaint did not qualify as protected activity.

¶32    The case that turned the Board around was a United States Supreme Court case, *Clark County School Board District v. Breeden*, 532 U.S. 268 (2001) (per curiam).[8] In *Breeden*, a female employee and two male employees were reviewing psychological

---

[8]Darvish contends on appeal that the Board improperly considered *Breeden* for the first time in a petition for rehearing, thus denying her "the opportunity to rebut it and to put on evidence which would substantiate, more solidly than she already does, the significance of the events which led to her termination." However, Darvish's brief includes no citation to the record showing that she preserved the claim before the Board by opposing the requested reconsideration on the ground that applicable law precluded the Board from considering the County's *Breeden* argument for the first time on request for reconsideration. *See* Utah R. App. P. 24(a)(5)(A). Nor does our own review of her written response to the request for reconsideration disclose that she presented this argument to the Board. Accordingly, we do not consider it.

evaluations of four job applicants. *See id.* at 269. The report on one applicant disclosed that he had once commented to a coworker, "I hear that making love to you is like making love to the Grand Canyon." *Id.* After the male employees had a chuckle, the female employee complained to her supervisors, who, she asserted, punished her for complaining. *See id.* at 269–70.

¶33     The Supreme Court held that "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard." *Id.* at 271. Sexual harassment is actionable, it stated, "only if it is so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* (alteration in original) (citations and internal quotation marks omitted). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). The Court described the incident in *Breeden* as an isolated incident "that cannot remotely be considered extremely serious, as our cases require." *Breeden,* 532 U.S. at 271 (citation and internal quotation marks omitted).

¶34     Upon reconsideration of Darvish's case, two members of the Board followed *Breeden,* concluding that "[b]ecause no reasonable person could believe that the conduct Ms. Darvish complained of"—a single reference to "these Persians"—"constituted discriminatory conduct, she could not have held a reasonable belief that discrimination existed." One member of the Board would have distinguished *Breeden* on the ground that, in *Breeden,* the employee "admitted she was not upset by the remark and more than a year and a half later was transferred."

¶35     The Utah Antidiscrimination Act, like Title VII, "depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses. 'Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances.'" *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67 (2006) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292 (1960)) (holding that a jury could reasonably conclude that a job reassignment and a thirty-seven-day suspension—even followed by reinstatement with back pay—may constitute retaliation).

¶36     Nevertheless, we are constrained by the limits of the antiretaliation statute. That statute does not protect employees from all retaliation, but only retaliation against an

employee for opposing an employer practice viewed reasonably and in good faith as prohibited by the Act. *Breeden*'s summary of the types of conduct that constitute employer discrimination is useful. To be actionable, harassment must be "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Breeden*, 532 U.S. at 270 (alteration in original) (citations and internal quotation marks omitted). In determining whether this is the case, a court must consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 270–71 (citations and internal quotation marks omitted). Thus, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Id*. at 271 (additional internal quotation marks omitted) (quoting *Faragher*, 524 U.S. at 788). *See also Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) ("[P]ervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim. Nevertheless, those two grounds are, to a certain degree[,] inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." (omission in original) (citations and internal quotation marks omitted)).

¶37    The coworker's comment at issue here fails all these tests. The frequency of the conduct was a single instance. The comment, while offensive, was not physically threatening, humiliating, or otherwise severe. The ALJ did not find that the comment interfered with Darvish's work performance. In short, the comment is most accurately described as an "off-hand comment," "an isolated incident," or "a mere offensive utterance"—precisely the type of conduct that the Supreme Court held no one could reasonably believe constituted unlawful *employer* discrimination. "[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not sufficiently alter the terms and conditions of employment to violate the Utah Antidiscrimination Act. *See Faragher*, 524 U.S. at 787 (alteration in original) (citation and internal quotation marks omitted) (interpreting Title VII). Darvish's workplace was not "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (citation and internal quotation marks omitted). In fact, the comment at issue, though offensive, did not include an ethnic epithet.

¶38    Darvish contends that her experience with the County is comparable to that described in *Crawford v. Metro Government of Nashville & Davidson County*, 555 U.S. 271 (2009). In that case, a human resources officer asked Crawford, a female employee, whether she had witnessed inappropriate behavior from a particular employee named Hughes. *See id.* at 274. Crawford described several instances of sexually harassing behavior: "[O]nce, Hughes had answered her greeting, 'Hey Dr. Hughes, what's up?,' by grabbing his crotch and saying '[Y]ou know what's up'; he had repeatedly 'put his crotch up to [her] window'; and on one occasion he had entered her office and 'grabbed her head and pulled it to his crotch.'" *Id.*

¶39    The question before the Supreme Court in *Crawford* was whether Crawford's report to the human resource officer's question constituted "opposition" (it did), not whether the conduct she reported constituted unlawful discrimination. *See id.* at 277–78. Nevertheless, the disparity between the conduct Crawford reported and the conduct Darvish reported is telling. Crawford reported a series of comments and gestures, including a brazen touching incident that was possibly tortious and definitely "physically threatening or humiliating," *see Clark Cnty. Sch. Bd. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) (citation and internal quotation marks omitted). In contrast, Darvish reported an isolated comment from a coworker. *Crawford* thus does not aid Darvish.

¶40    Darvish also makes an alternative argument, claiming that the *Breeden* standard is satisfied by the pervasive retaliatory actions of her supervisor. She contends that this case involves, not an isolated comment, but a constellation of employer conduct, including negative employee evaluations and bogus disciplinary charges. However, this argument confuses cause and effect. The ALJ's findings describe serious retaliation against Darvish, but this retaliation followed as a result of her original complaint. The relevant question in this case is whether a reasonable employee could believe in good faith that the conduct preceding her complaint—the employment practice that provoked her complaint that in turn triggered the retaliation—constituted an unlawful practice under the Act.

¶41    We recognize that "[t]he legislative purpose in including the antiretaliation provision was obviously to encourage people to come forward and expose unlawful employment practices and to do so without fear of reprisal." *Kalany v. Campbell*, 640 S.E.2d 113, 118 (W. Va. 2006) (citation and internal quotation marks omitted) (construing West Virginia state law). We also recognize that that object would be

"defeated if its protection applied only to those individuals who confidently know the technical area of fair employment law and who correctly predict how its doctrine will ultimately be applied in a court of law." *Id.* Nevertheless, the antiretaliation provision by its own terms protects employees only from retaliation visited upon them for having opposed employment practices made unlawful by the Act.[9] We therefore cannot avoid considering what the Act—and its federal counterpart—in fact makes unlawful. Doing that requires us to view the matter in the context of relevant statutory provisions and case law. And in that context, we are constrained to agree with the Board that a coworker's isolated, offensive comment of the type made here cannot reasonably be regarded as workplace discrimination on the part of the employer. Therefore, the Utah Antidiscrimination Act does not protect Darvish from retaliation—however cynical or offensive—for having reported it.

CONCLUSION

¶42 The order of the Board granting the County's request for reconsideration was jurisdictionally valid. Absent disposition by the Board, such requests are deemed denied twenty days after filing. Nevertheless, controlling case law makes clear that the Board retains jurisdiction to act on them thereafter, as the Board did here.

¶43 Furthermore, the Board's order was legally correct. The Utah Antidiscrimination Act protects employees when their employers retaliate against them for opposing unlawful employer discrimination. However, this protection does not extend to other forms of retaliation. Therefore, while the employee is not required to show that the practice she opposes actually satisfies the legal definition of workplace discrimination, she must show that a reasonable person could in good faith believe that it does. A coworker's single, off-hand remark of the sort made here does not meet this standard. Consequently, the Act does not shield Darvish from the retaliation unleashed upon her for reporting it.

---

[9]It could of course have been drafted otherwise. Darvish would have no trouble prevailing under a provision that protected employees from employer retaliation based on their having reported offensive workplace comments about their religion, national origin, and so forth. But neither the Utah Antidiscrimination Act nor Title VII affords that level of protection.

¶44    The remaining issues on appeal either are not properly before us or are rendered moot by these holdings.  The parties shall bear their own costs and fees.

_____
J. Frederic Voros Jr.,
Associate Presiding Judge

-----

¶45    WE CONCUR:

_____
Gregory K. Orme, Judge

_____
James Z. Davis, Judge